UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY



RECEIVED

JUN 2 1 2024

AT 8:30_____M
CLERK, U.S. DISTRICT COURT - DNJ

CLYDE PONTEFRACT,et al.,                    CASE No:
Plaintiff,

V

UNITED STATES OF AMERICA,et al.,                    COMPLAINT
Defendant.

## I. JURISDICTION AND VENUE

1. Jurisdiction is proper under 28 USC §1346(b) and §2671 et seq for money damages against the United States of America through its agency, the Federal Bureau of Prisons for a violation of the Eighth Amendment under the United States Constitution while violating federal statutes and agencies regulations during the COVID-19 pandemic that endangered Pontefract and all like prisoners past, present, and future health from COVID-19.

2. Jurisdiction is proper under 28 USC §1331 in the challenging of the United States claim of Sovereign Immunity under the Discretionary Function Exception when reasonableness is applied under the deliberate indifference claim of an Eighth Amendment cruel and inhuman violation.

3. The Federal Bureau of Prisons denied Pontefract's Tort claim on Dec. 21 2023. Exhibit A

4. Venue is proper under 28 USC §1391(e)(1).

## II. PLAINTIFF

5. Clyde Pontefract is the plaintiff in this complaint who is and has been an inmate incarcerated with the Federal Bureau of Prisons and housed at both FCI Elkton and FCI Fort Dix during the COVID-19 pandemic.

6. All like federal inmates (prisoners) that have been incercerated at FCI Elkton and FCI Fort Dix within the Federal Buresau of Prisons and housed during the COVID-19 pandemic.

## III. DEFENDANT

7. The United States of America is the defendant with the Federal Bureau of Prisons the responsible agency in this complaint. The Federal Bureau of Prisons Central Office is the main authority of the "Federal Bureau of Prisons's COVID-19 Action Plan" and its enforcement through the facilities of FCI Elkton and FCI Fort Dix.

## IV. FACTS
### A. INTRODUCTION

8. In December of 2019 the coronavirus disease was first described in Wuhan, China and spread rapidly becoming a global pandemic.

9. The coronavirus disease became known by the name of "COVID-19". The COVID-19 pandemic arrived at the Federal Bureau of Prison's institutions in mid-March of 2020.

10. COVID-19 was known to the United States Government in December of 2019 and the United States Congress knew of the serious problem approching the Bureau of Prisons and explained

in a letter.

11. In march of 2020 the President signed into law the CARES ACT for the purpose of lowering the federal prison population.

## B. FCI Elkton

12. COVID-19 arrived at FCI Elkton in Ohio during March of 2020.

13. On March 23 2020 the Center for Disease Control and Prevention (CDC) acknowledge that correctional and detention facilities present unique challenges for the control of COVID-19 transmission among incarcerated persons and staff. [1]

14. Phase One of the Bureau of Prisons Action Plan that involved creating a strategic response plan had began in January 2020.

15. Phase Two which suspended social and legal visits, inmate facility transfers, staff travel and training, and begun health screening of arriving inmates and staff for COVID-19 symptoms and risk factors on March 22 2020. [2]

16. Phase Two also modified operations to maximize physical distancing, staggering of meals and recreation times, grab and go meals, and establishing quarrentine and isolation procedures. [3]

17. Phase Three involved inventoring the Bureau of Prisons cleaning, sanitation, and medical supplies. [4]

18. Phase Four involved the expanding the initial procedures to mandate use of a screening tool and temperature check and required asymptomatic arrivals to be placed in quarantine for fourteen days and symptomatic arrivals to be isolated until they

tested negative for COVID-19 or were cleared by medical staff and this was implemented on March 26 2020. [5]

19. On March 31 2020 Phase Five was implemented. Phase five required all inmates to be secured to their quarters for a fourteen-day period with limited access to commissary, laundry, showers, telephone, and other services.

20. Phase Six extended Phase Five through May 18 and was ordered on April 13.

21. Within the precedings from Wilson V Williams, the declarations and misconstrued facts of what was really happening at FCI Elkton.

· (i) No sanitizer nor soap was given to the inmates in March and April outside of our regular monthly issue of hygene. The declaration of Mrs. Dees lied to the court on this issue.

·(ii) During Phase Two of the Modified Operations that included the maximize physical distancing that includded the staggering meals and recreation times were also lies. The physical distancing could not be accomplished because of the over-crowding and the staggering of meals, had at multiple times, overlapped inmates from other units spreading the virus completely through the facility.

22. The United States of America of the Federal Bureau of Prisons and Warden Williams purposely pushed back against the protection and health of the inmates residing in the unsafe conditions caused by the COVID-19 pandemic. [6]

23. The Federal Bureau of Prison's Unconstitutional behavior was

later brought to light by other courts through public record and through the Congressional Officers  of Senator Sherrod Brown and Representatives, Marcy Kapyus, Marcia Fudge and Tim Ryan. [7]

24. On March 31 of 2023, "the BOP implemented Phase Five [that] required all inmates to be secured to their quarters for a fourteen-day period with limited access to the commissary, laundry, showers, telephone, and other services." [8]

25. "Phase Six, ordered on April 13, extended Phase Five through May 18." [9]

26. FCI Elkton began and then after a short period of time ended the temperature screening of the inmates. The BOP/FCI Elkton did stop this screening because of inmate workers still being moved throughout the units and facility. FCI Elkton also claimed that they were using enhanced screening before and after assigned work details. This was not true. The BOP/FCI Elkton was using self-monitoring by inmates and we were told to self-report-our-symptoms.

27. Inmates at FCI Elkton in March and through the begining of April 2020 was being issued our normal monthly amount of hygiege, two 4oz soap bottles. Not untill sometime in April of 2020 did we receive extra saop bottles. As we were denied commissary in the begining (March 2020) we could not buy any soap or sanitizer. [10] It was sometime after the inmates partial restoring of commissary, [11] that the extra hygiene soap bottles were issued.

28. Sometime in April the inmates were issued Mask. [12]

29. Approximately the end of March to mid-April 2020 Pontefract contracted COVID-19. Extreem symptoms were persistent, runny nose, coughing, weakness, tiredness, fever, and difficulty

breathing. During this time Pontefract felt so bad that he told himself that if he woke up feeling worst that he was going to report himself to medical. After four days he started to feel better and he slowly recovered. [13]

30. Mask were double layered and made of a heavy and tightly woven material that no-air could be filtered through its cloth. Because of this heavy material all air contaminates from COVID-19 went around the cloth whether breathing in or out in which caused another factor as to why there was fast and wide exposures to the inmates at FCI Elkton.

31. On may 26 2020, Pontefract received his first COVID-19 test with a negative result. A recording of Asymptomatic was recorded. [14] Exhibit B

32. On June 23 2020, Pontefract received his second COVID-19 test with a negative result. Exhibit C

33. On June 30 2020, Pontefract tested positive for COVID-19. Exhibit D

34. On July 16 2020, Pontefract received his fourth COVID-19 test with a negative result. Exhibit E

35. Pontefract was housed in unit C/B and stayed in this unit while many inmates were moved to isolation units. This was performed by inmates testing as positive with COVID-19 or through the contract tracing procedures. When Pontefract tested positive for COVID-19 he was moved to isolation unit E/B, and approximately a month later he tested negative for COVID-19. See ¶ 32-33.

36. Pontefract was moved back to C/B and was placed in a cube

with a non-sex-offender.

37. Within a week there was another inmate compound move. This time staff moved in Pontefract's cube other non-sex-offenders and even though his bunk was assigned to himself, two inmates forced him out of the cube to an unassigned bunk.

38. During these moves there were rarely any staff around to facilitate moves for organization or for safety.

39. Pontefract was now in jeopardy of receiving an incident report for being out of bounds. Pontefract argued with staff members to go to the LT's Office. Eight staff members that included four LT's and an SIS Officer refused to fix the problem and because Pontefract would not go back to the unit that would of instilled an inmate fight and because of being a sex-offender he was sent to the Special Housing Unit (SHU). A week later Pontefract came out of the SHU and was sent back to unit C/B. He went into a different cube that was empty and another sex-offender was assign to the same cube.

40. Approximately a month later FCI Elkton started to prepare for a massive inmate movement to other facilities to lower the inmate population at FCI Elkton so that Social Distancing at FCI Elkton.

41. Pontefract was moved to the chapel that was as aquarantine unit for a 14 day period to be transfered to another facility.

42. Pontefract was held in the chapel with approximately 32 other inmates. Meals were brought to us but if an inmate was not present and attentive another inmate would take his meal. Staff would not care if an inmate would miss his meal. This happened to Pontefract once.

43. All inmates within the chapel took showers in the same stall that had a toilet.

44. Pontefract's time to be transferred and medical came to test him for COVID-19. The test swab had barely went into the nasal cavity.

45. Pontefract and like inmates were transferred by BOP staff on a security bus. Staff were not waring mask during the transit.

## C.   FCI FORT DIX

46. Pontefract arrived at FCI Fort Dix in October of 2020 and was tested for COVID-19 the same day. This test was taken and hurt because of the staff inserting the swab deep into the nasil cavity while pushing in and twisting. Some like inmates were bleeding in the nasil cavity from these test. _____

48. Pontefract and all like inmates were housed in unit 5703 on the east side and was kept separate from the other units at FCI Fort Dix.

49. Pontefract was weeks without receiving any institutional clothing. Pontefract could not wash cloths because he only had one set. After a couple of weeks he received clothing but no shoes. All like inmates had received clothing but each inmate was missing verious items from each issue.

50. Pontefract and all like inmates in 5703 had received meals in the unit of 5703. Occasionally we were allowed to go to the chow hall away from other units and floors in 5703. A couple of times Pontefract had to go to the chow hall in slippers and no socks because he never received shoes. Each/time this happened the whether was cold and raining.

51. Pontefract and all like inmates within unit 5703 were separated by floors depending on positive or negative test results from COVID-19. We were also separated by time of the COVID-19 test for the purposes of quarantine.

52. After a couple of months (some inmates were held much longer) as increased negative COVID-19 test results were negative within a cohart, Pontefract and all like inmates were released from unit 5703 and moved to other units.

53. Pontefract was moved from 5703 to 5711.

54. Pontefract went through COVID-19 for approximately two years being locked down in unit 5711. Each time an inmate tested positive for COVID-19 they would be moved to an isolation unit. When there was a larger number of inmates that were tested positive for COVID-19 the isolation unit would be floor(s) in 5711. Exhibit F

55. When inmates were moved to isolation areas, we all moved at the same time, both positive and negative inmates. This caused negative COVID-19 inmates to become positive with COVID-19 and the 21 day quarantine periods kept mixing inmates. This constant shuffling caused constant exposures and extended quaratines.

56. Pontefract had contracted COVID-19 often by having COVID-19 symptoms often even while test had shown negative COVID-19 test results.

57. During winter months the units at FCI Fort Dix has no circulation of air. The units are heated with a boiler symptom with rooms having ceiling fans. There is no filtered air that would help in filtering the COVID-19 disease.

58. During summer months the units at FCI Fort Dix turn on hugh outside blowers. These blowers pull air from the inside of the units and expells air to the outside. Staff mandated that windows are to be closed and claims that this will cool the unit because of no air-conditioning. This creates negative pressure and keeps all viruses inside the units. There is no return filtered air being returned into the units.

## V. HELLING V McKINNEY, 509 US 25 (1993)

59. Plaintiff(s) realleges paragraphs 8 - 58 as if set forth fully here.

60. This claim is brought pursuant to 28 USC §1331.

61. The Fifth Amendment's Due Process is in contradition with the second prong of deliberate indifference when the standard of reasonableness is used as a jurisdictional block to court and jury access.

62. The Standard of Reasonableness when used in a way to support the weakening of the Eighth Amendment's crual and unusual clause of the United States Constitution of a severe and serious health risk or a death from a dangerous virus is in contradiction with Helling V McKinney, 509 US 25 (1993).

63. The Objective prong of deliberate indiffence is supported by the failing of the Federal Bureau of Prisons to act with deliberate indifference to a substantial risk of serious harm to all inmates at both FCI Elkton and FCI Fort Dix from COVID-19 between March of 2020 to presently and recklessly disregarding that risk.

64. The Subjective prong can not be satisfied by the Federal Bureau of Prisons responding reasonable to COVID-19 when multiple deaths occured, 100's went to the hospital, and 1000's were sick with COVID-19 and has strong chances of having Long-COVID.

65. Helling V McKinney stated that the prisoner had a cause of action under the Eighth Amendment by alleging that a state prison system was deliberately indifferent by exposing him to

levels of ETS (Environmental Tobacco Smoke) in which posed an unreasonable risk of harm to his future health. See at 509 US 35, (1993).

66. The Federal Bureau of Prisons violated the Subjective prong of the deliberate indifference standard when they had a sufficiently culpable state of mind that Pontefract and all like inmates would be subjected of a substantial risk of serious harm or death from COVID-19 by not supporting the six foot social distancing at FCI Elkton and FCI Fort Dix by not providing a safe environment of social distancing in unventilated units.

67. The Federal Bureau of Prisons disregarded this risk by disagreeing with the district court in Northeast Ohio, Congress's Laws, and the President by authorizing the most vulnerable inmates to be placed on home confinement through the Cares Act, and directives in which would have increased the social distancing mandates and would of supported an increase of individual inmate social distancing at both facilities.

68. The Federal Bureau of Prisons did not act reasonable in controlling COVID-19. Pontefract and all like inmates contracted COVID-19 or had symptoms. The Federal Bureau of Prisons actions were not reasonable and is in contradiction of Helling V McKinney when the rule states that any possibilities of contracting a disease is an unreasonable risk of harm to a persons present and future health.

## VI. INTENTIONAL AND NEGLIGENT INFLICTION
## OF EMOTIONAL DISTRESS

69. Plaintiff(s) realleges paragraphs 8 - 58 as if set forth fully here.

70. This claim is brought pursuant to 28 USC §2671 et seq., and §1346(b).

71. This claimis brought pursuant to a claim of Intentional and Negligent Infliction of Emotional Distress that has the elements of 1) conduct must be extreme or outrageous, 2) the conduct must be intentional or reckless, 3) the conduct must cause emotional distress, and 4) the distress must be severe.

72. The conduct of extreme or outrageous is defined as conduct so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society.

73. The Federal Bureau of prisons knew that COVID-19 causes severe and serious health issues and can cause death. The Federal Bureau of prisons also knew that social distancing of at least six feet must be maintained to reduce this risk, but they did not allow nor support the social distancing of six feet within FCI Elkton nor FCI Fort Dix.

74. The Federal Bureau of Prisons knew that Pontefract and all like prisoners were helpless to protect themselves by securing themselves and being able to keep at least six feet of secial distancing from each other at both facilities of FCI Elkton and FCI Fort Dix.

75. The Federal Bureau of Prisons knew that the six foot social

distancing could not be attained and issued masks that 1) did not work because of the heavy fabric, and 2) was impossible to ware 24/7 for over three years straight.

76. During the summers FCI Fort Dix's units are operated with no air filtration and with negative pressure that keeps all air born viruses inside the units through negative pressure.

77. The cruel and inhumane clause of the Eighth Amendment was violated against Pontefract and all like prisoners who had no avenues to protect themselves from the COVID-19 virus.

78. Pontefract and all like inmates supported by this complaint that tested positive and/or had the symptoms of COVID-19 has supported the Physical Injury requirement from 28 USC §1346(b)(1).

79. Pontefract and all like inmates supported by this complaint that repeatedly had acquired COVID-19 amounts to a higher risk and greater assurance of having Long-COVID in a much deeper and severe occurrence that places serious higher risk from COVID - 19 disease presently and in the future.

80. Pontefract has fear and anxiety along with headaches, tiredness, and constant cold like symptoms throughout each and every month since March of 2020 to presently.

81. Pontefract is within the "Zone of Danger of Physical Impact" by 1) twice testing positive for COVID-19, and 2) having the symptoms of COVID-19 regularly every month, at times weekly, since March of 2020.

## DAMAND FOR JUDGEMENT

WHEREFORE, Plaintiff(s) request relief and judgement against Defendant United States of America as follows :

1) For damages in an amount of $ 10,000,000 for Pontefract ;

2) For damages in an amount of $ 10,000,000 for all like inmates ;

3) For damages of medical procedures for Long-Covid after Pontefract and all Like Inmates have returned to society;

4) Such further relief as the Court finds just and equitable.

I declare under penalty of perjury that the foregoing is true and correct.

Date : June 1⁊ 2024

Clyde Pontefract, 13955-035
FCI Fort Dix
PO Box 2000
Joint Base MDL, NJ 08640

FOOT NOTES
(Complaint)

1. Interim Guidance on Management of Coronavirus Disease 2019 in Correctional and Detention Facilities, Center for Disease Control (Mar 23, 2020).

2. Wilson V <u>Williams</u>, 961 F.3d 829, 834 (CA6, 2020)

3. Wilson V <u>Williams</u>, at 961 F.3d 834.

4. Wilson V <u>Williams</u>, at 961 F.3d 834

5. Wilson V <u>Williams</u>, at 961 F.3d 834

6. Wilson V <u>Williams</u>, at 961 F.3d 835-36, Within section I. C. (Notice of the three filing by the BOP on April 27-28, May 20, and May 27, that, 1) filed for an emergency motion for an administrative stay, 2) the filing of an application for a stay of the district court's April 22d preliminary injunction order and May 19th enforcement order to the Supreme Court, 3) the filing of an appeal from the May 19th enforcement order and stay.)

7. United States V Babbit, 469 F. Supp. 3d 903, 913 (E.D.PA., 2020, (Oct 21st))

8. Wilson V <u>Williams</u>, at 961 F.3d 834; But FCI Elkton was already on lock-down.

9. Wilson V <u>Williams</u>, at 961 F.3d 834

10. Wilson V <u>Williams</u>, at 961 F.3d 834; The lack of commissary was only for a short time.

11. My notes were lost by either the constant moving of inmates

or by staff taking them during shack-downs.

12. This information is to the best of my memory.

13. The whole unit was sick while over half was also experiencing very sick symptoms and we seen medical emergencies  leaving the units and compound that averaged two to four per day for several weeks. (Bop records will verify this information.)

14. This first testing was well after myself and all like inmates went through our first round of COVID-19.